# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
November 1, 2012 Session

## BOBBY GLEN CROCKER v. STATE OF TENNESSEE

**Direct Appeal from the Circuit Court for Carroll County**
**No. 05CR98       Donald E. Parish, Judge**

---

**No. W2012-00960-CCA-R3-PC  - Filed May 28, 2013**

---

The Petitioner challenges the Carroll County Circuit Court's dismissal of his petition for post-conviction relief from his conviction of second degree murder and resulting thirty-year sentence. On appeal, the Petitioner contends that the post-conviction court erred by dismissing the petition as time-barred because his mental incompetence tolled the one-year statute of limitations for filing the petition. Based upon the oral arguments, the record, and the parties' briefs, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court is Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the Court, in which ROGER A. PAGE, J., joined. JOSEPH M. TIPTON, P.J., filed a separate concurring opinion.

J. Neil Thompson, Huntingdon, Tennessee, for the appellant, Bobby Glen Crocker.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Assistant Attorney General; Hansel Jay McCadams, District Attorney General; and R. Adam Jowers, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I.  Factual Background

The Carroll County Grand Jury indicted the Petitioner for first degree premeditated murder for the October 2004 killing of his estranged wife. In November 2004, Pathways Behavioral Health conducted a competency evaluation and concluded that, based on the Petitioner's mental retardation, he was incapable of defending himself at trial. In February 2005, Western Mental Health Institute assessed the Petitioner and found him to be "functioning within the [m]oderate range of mental retardation." The State filed a motion

requesting that, based on the "mixed messages" of the two evaluations, a mental retardation specialist re-evaluate the Petitioner. In April 2005, a mental retardation specialist from the Department of Mental Health evaluated the Petitioner and concluded that he was capable of defending himself at trial. On March 20, 2006, the Petitioner pled guilty to second degree murder and received a thirty-year sentence to be served at one hundred percent.

On February 1, 2011, the Petitioner filed a pro se petition for post-conviction relief, raising several issues, including that he was actually innocent of the crime and received the ineffective assistance of trial counsel. The State filed a motion to dismiss the petition on the basis that it was time-barred. The post-conviction court concluded that it should conduct an evidentiary hearing to determine whether due process required tolling the one-year statute of limitations and appointed counsel to represent the Petitioner. Counsel filed an amended petition, arguing that the statute of limitations should be tolled due to the Petitioner's mental incompetence. In support of the amended petition, counsel attached the Petitioner's medical records since the entry of his guilty plea. In October 2011, the post-conviction court ordered that Pathways evaluate the Petitioner to determine whether he was competent to participate in the post-conviction process, and the evaluator concluded that the Petitioner was competent.

In April 2012, the post-conviction court conducted the evidentiary hearing to determine whether the Petitioner's alleged mental incompetence tolled the statute of limitations. At the hearing, Anne McSpadden, a psychologist at West Tennessee State Penitentiary, testified as an expert in psychology that she met with the Petitioner one time in April 2006. The Petitioner had been referred to her in order for her to determine whether he was eligible to participate in a program for low-functioning inmates and whether he would benefit from "some type of therapy." Dr. McSpadden met with the Petitioner for twenty to thirty minutes and determined that he was not eligible for the program due to the length of his sentence and the severity of his crime. At the time of their meeting, the Petitioner had just entered the Department of Correction and was receiving treatment for major depression. Dr. McSpadden said the Petitioner seemed to have trouble remembering things and "had issues surrounding his case and . . . was confused." She explained that people with major depression typically "experience significant impairment in their day to day ability to work, manage their affairs, and to just deal with the day to day stressors." The Petitioner also had been diagnosed with post-traumatic stress disorder (PTSD), which could cause flashbacks and nightmares, and was taking several antipsychotic and antidepressant medications. He reported to Dr. McSpadden that he had very little education and could not read or write. Dr. McSpadden stated, "I would think that it would be very difficult for anybody in this day and time to not be able to read and write to deal with what we have to do from day to day."

Dr. McSpadden testified that the Petitioner could not remember much about what had

happened in the past. She said that in 2004, Pathways had determined that his IQ was 60, which "falls in the mildly mentally retarded branch." She explained that people diagnosed as mildly mentally retarded had impaired judgment in most areas of their lives and usually required supervision and monitoring. If they worked, they usually had to have a job coach help them, and they often lived in supervised care homes or with their families. Dr. McSpadden stated that in her experience, people with an IQ of 60 usually functioned on a reading and writing level of third grade or less and would have to have assistance managing their personal affairs. Dr. McSpadden said that in her opinion, it would be very difficult for the Petitioner to manage his personal affairs or understand legal options available to him. She said that some of her opinions about the Petitioner were based on events that occurred after she interviewed him in April 2006.

On cross-examination, Dr. McSpadden testified that there were "significant differences" in people diagnosed as mildly mentally retarded. With support and help, some of them could maintain a fairly normal life without constant supervision. The State showed Dr. McSpadden a report from an evaluation conducted on the Petitioner by the Department of Mental Retardation Services in April 2005. She acknowledged that the report indicated the Petitioner could read, check his own blood sugar levels, and perform a difficult task such as changing the clutch in his truck. She also acknowledged that the report indicated the Petitioner worked in a factory for twenty-three years, owned a furniture shop for three years, and worked as a sharecropper for about thirteen years. However, she was not sure the information in the report was accurate. Dr. McSpadden acknowledged that the Petitioner's 2005 evaluation assessed whether he was malingering and that the evaluator concluded the Petitioner was malingering. The Petitioner's April 2005 evaluation was conducted over a two-day period and was more detailed than the twenty- to thirty-minute interview Dr. McSpadden conducted in April 2006. Dr. McSpadden did not diagnose the Petitioner with any conditions as a result of their interview, and she did not see him again.

On redirect examination, Dr. McSpadden testified that in April 2005, the Petitioner's Global Assessment of Function (GAF) test score was 60. She said that GAF measured "how well a person is doing relative to the general population" and that a score of 60 meant "he has impairment. He either has moderate impairment in one area or mild impairment in all three areas of his life. And those areas being work, relationships, and the other use of available time." She acknowledged that according to the Petitioner's November 2004 evaluation, Pathways concluded that he was incompetent to stand trial due to his mental retardation.

The Petitioner testified that people at the prison prepared his paperwork for him, told him how to do his job, and told him when to take a shower. He said inmates "[do] my business" and "[g]et my clothes." Sometime before the Petitioner entered prison, his brother obtained power of attorney over his affairs because he could not make decisions. He said he

could sign his name but could not read or write. The State asked if he was able to understand his legal responsibilities and obligations, and the Petitioner answered, "I guess I do. Yeah." He said that he "didn't have nothing to do" with the filing of his pro se petition for post-conviction relief and that he did not understand the information in the petition. He also said that he did not understand that by filing the petition, the post-conviction court could order that his guilty plea be withdrawn and that he go to trial.[1] The guards and nurses assisted the Petitioner in prison. He said that he went to the prison hospital twice per day for blood sugar monitoring, that he ate too much food, that he did not know what foods he could eat, and that "they have to take it away from me."

On cross-examination, the Petitioner acknowledged that he signed his petitions for post-conviction relief but said that he did not know why the petitions were filed. He acknowledged that an individual named Peter Jenkins prepared his pro se petition and said that Jenkins "writes my letters and [tells] me what to do." The Petitioner stated that he signed whatever Jenkins told him to sign and that he did not know anything about the law. He acknowledged that he had a prison job but said, "They pay me, but I don't do nothing. . . . Well, the other guy does the job. He tells me what to do." He acknowledged that he used to work in a factory and said that he worked there more than twenty-three years. He also worked as a sharecropper but never owned a furniture shop. He stated that he "told people stuff to make me look good . . . because [they] was calling me retarded" and that "I ain't normal." He said that when he visited the prison doctor, other inmates told him what to tell the doctor because the inmates did not want him "[put] in the crazy house." The State asked the Petitioner if he had ever resided in a supervised home facility, and he answered, "I don't understand a word you [are] saying."

On redirect examination, the Petitioner testified that he could not learn in school. He said that when he was ten years old, he was told that he was "retarded" and that his going to school was "useless."

Samantha Phillips testified that she was the Health Administrator at Northwest Correctional Complex, where the Petitioner was an inmate. She identified the Petitioner's medical records, and the State introduced the records into evidence. Phillips stated that she was familiar with the policies and procedures for appointing conservators for inmates and that nothing in the records indicated a conservator had been appointed for the Petitioner.

---

[1] We note that just before the evidentiary hearing, counsel for the Petitioner informed the post-conviction court that the Petitioner did not want to proceed with the petition or the hearing. Counsel questioned the Petitioner under oath in front of the State and the court, and the Petitioner confirmed that he did not want to proceed because "I don't want another trial." However, the post-conviction court decided that "it's best to proceed here today."

In a written order, the post-conviction court concluded that the Petitioner failed to show by clear and convincing evidence that within one year of his judgment of conviction becoming final, he "lacked the mental capacity to manage his personal affairs and to understand his legal rights." Thus, the post-conviction court concluded that the statute of limitations should not be tolled and dismissed the petition for post-conviction relief as time-barred.

## II. Analysis

The Petitioner contends that the post-conviction court erred by concluding that the statute of limitations should not be tolled in this case because he showed that, due to his mental incompetence, he was unable to manage his personal affairs or know his legal rights and responsibilities. The State argues that the post-conviction court properly determined that due process did not require tolling the statute of limitations. We agree with the State.

Generally, "[r]elief under [the Post-Conviction Procedure Act] shall be granted when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103. However, to obtain relief, the post-conviction petition must be filed within one year of the final action of the highest state appellate court to which the petitioner appealed, or, in the event no appeal was taken, within one year of the date the judgment(s) of conviction became final. Tenn. Code Ann. § 40-30-102(a); see also Williams v. State, 44 S.W.3d 464, 468 (Tenn. 2001). The statute emphasizes that "[t]ime is of the essence of the right to file a petition for post-conviction relief" and that "the one-year limitations period is an element of the right to file such an action and is a condition upon its exercise." Tenn. Code Ann. § 40-30-102(a). In this case, the Petitioner pled guilty and was sentenced on March 20, 2006. He was required to file his petition for post-conviction relief within one year of April 19, 2006, the date his judgment became final. See Tenn. Code Ann. § 40-30-102(a); State v. Green, 106 S.W.3d 646, 650 (Tenn. 2003) (holding that "a judgment of conviction entered upon a guilty plea becomes final thirty days after acceptance of the plea agreement and imposition of sentence"). He did not file his petition until February 1, 2011, almost five years after his statute of limitations expired.

However, our supreme court has held that the statute of limitations may be tolled in cases where its strict application would deny the petitioner "a reasonable opportunity to assert a claim in a meaningful time and manner." Williams, 44 S.W.3d at 468 (quoting Seals v. State, 23 S.W.3d 272, 279 (Tenn. 2000)). One of the due process bases for tolling the statute of limitations involves defendants "whose mental incompetence prevents them from complying with the statute's deadline." Whitehead v. State, ___ S.W.3d ___, No. W2010-00784-SC-R11-PC, 2013 Tenn. LEXIS 310, at **21-22 (Tenn. Mar. 21, 2013).

Specifically, our supreme court held in State v. Nix, 40 S.W.3d 459, 463 (Tenn. 2001), that "due process [required] tolling of the post-conviction statute of limitations only if a petitioner [showed] that he [was] unable either to manage his personal affairs or to understand his legal rights and liabilities." To make a prima facie showing of incompetence for tolling the statute of limitations, the petitioner had to attach to the petition "affidavits, depositions, medical reports, or other credible evidence that contain specific factual allegations showing the petitioner's incompetence." Nix, 40 S.W.3d at 464. If the petitioner made a prima facie showing, the trial court had to conduct a hearing to determine whether the Petitioner was incompetent. Reid ex rel. Martiniano v. State, ___ S.W.3d ___, No. M2009-00128-SC-R11-PD, Nos. M2009-00360-SC-R11-PD & M2009-01557-SC-R11-PD, 2013 Tenn. LEXIS 84, at *22 (Tenn. Jan. 24, 2013). In making this determination, a civil standard of competency applied. Nix, 40 S.W.3d at 463. Moreover, the petitioner had the burden of proving by clear and convincing evidence that he or she was incompetent. Reid v. State, 197 S.W.3d 694, 703-05 (Tenn. 2006).

Turning to the instant case, we conclude that the record supports the post-conviction court's determination that the Petitioner did not present clear and convincing evidence that he was incompetent during the one-year period, or any period, following the date that his judgment became final. Even if the Petitioner made a prima facie showing of mental incompetence, the expert witness who testified at his evidentiary hearing stated that she interviewed the Petitioner for only twenty to thirty minutes in April 2006. The purpose of their meeting was not for Dr. McSpadden to determine the Petitioner's mental competency but to determine whether he was eligible to participate in a program for low-functioning inmates or receive therapy. The Petitioner had just entered the Department of Correction, had been diagnosed with major depression and PTSD, and was taking several medications for those conditions. Dr. McSpadden described him as "mildly mentally retarded" and said he had trouble remembering things and seemed confused. However, she made only general conclusions regarding his ability to manage his personal affairs or understand his legal rights and liabilities. For example, she said that people diagnosed as mildly mentally retarded generally had impaired judgment in most areas of their lives, required supervision, and needed assistance managing their personal affairs. She also stated that "significant differences" existed in people diagnosed as mildly mentally retarded and that some people could maintain a fairly normal life without constant supervision. Although she stated that, in her opinion, it would be very difficult for the Petitioner to manage his personal affairs or understand his available legal options, she failed to provide any specific facts that demonstrated he had been unable within the past seven years to manage his personal affairs or understand his legal rights and liabilities.

Moreover, although the Petitioner claimed at the hearing that his brother had power of attorney over his affairs, he did not have his brother testify as a witness to explain his

brother's legal responsibilities arising from his alleged incompetence. See Bryant Adair v. State, No. W2010-01608-CCA-R3-PC, 2011 Tenn. Crim. App. LEXIS 496 at *9 (Jackson, June 30, 2011). Likewise, the Petitioner claimed that inmates helped him with his personal affairs and legal matters, but he did not have those witnesses testify about their knowledge and observations of his alleged mental incompetency. See id. Although the post-conviction court did not specifically address the Petitioner's credibility in its order, we can infer from the court's determination that the statute of limitations should not be tolled that the court did not accredit the Petitioner's testimony. Id. at *10. Therefore, we agree with the post-conviction court that the Petitioner has failed to show by clear and convincing evidence that he suffered from mental incompetence that tolled the statute of limitations.

We note that recently, our supreme court announced a new standard for determining competency in post-conviction cases such as this one, stating that "the standards and procedures in Tenn. Sup. Ct. R. 28, § 11 should henceforth be used in all post-conviction proceedings, including those currently awaiting decision, in which the issue of the petitioner's competency is properly raised." Reid ex rel. Martiniano, ___ S.W.3d at ___, No. M2009-00128-SC-R11-PD, Nos. M2009-00360-SC-R11-PD & M2009-01557-SC-R11-PD, 2013 Tenn. LEXIS 84, at *90. Tennessee Supreme Court Rule 28, section 11(B)(1), states as follows:

> The standard for determining competency of a petitioner to withdraw a post-conviction petition and waive further post-conviction relief under this section is: whether the petitioner possesses the present capacity to appreciate the petitioner's position and make a rational choice with respect to continuing or abandoning further litigation or on the other hand whether the petitioner is suffering from a mental disease, disorder, or defect which may substantially affect the petitioner's capacity.

To aid a post-conviction court's analysis regarding a petitioner's mental competency, the court directed that post-conviction courts use the following three-step test from Rumbaugh v. Procunier, 753 F.2d at 395, 398-99 (5th Cir. 1985):

> (1) Is the person suffering from a mental disease or defect?
>
> (2) If the person is suffering from a mental disease or defect, does that disease or defect prevent him from understanding his legal position

and the options available to him?

> (3) If the person is suffering from a mental
> disease or defect which does not prevent him
> from understanding his legal position and the
> options available to him, does that disease or
> defect, nevertheless, prevent him from making a
> rational choice among his options?

If the answer to the first question is no[;] the court need go no further, the person is competent. If both the first and second questions are answered in the affirmative, the person is incompetent and the third question need not be addressed. If the first question is answered yes and the second is answered no, the third question is determinative; if yes, the person is incompetent, if no, the person is competent.

Id. at **93-94. The court explained that

> [t]he third step asks whether a prisoner, despite his or her mental
> disease or defect, is capable of making a rational choice from
> among the available post-conviction options. A decision may be
> rational even when it is not one that the majority would consider
> acceptable, sensible, or reasonable. A decision is rational when
> it is based on a process of reasoning. [In re Conservatorship of
> Groves, 109 S.W.3d 317, [336] (Tenn. Ct. App. 2003)]. A
> person's decision-making process is rational when that person
> can (1) take in and understand information; (2) process the
> information in accordance with his or her personal values and
> goals; (3) make a decision based on the information; and (4)
> communicate the decision. Groves, 109 S.W.3d at 335.66

Id. at **94-95.

The post-conviction court dismissed the Petitioner's petition pursuant to Nix nine months before the supreme court filed Reid ex rel. Martiniano. In any event, the lack of any specific proof in this case regarding the Petitioner's ability to understand his legal position and the options available to him or his ability to make a rational choice among his options would support the post-conviction court's dismissal of the petition under either standard. Therefore, we conclude that the post-conviction court properly dismissed the petition.

-8-

### III.  Conclusion

Based upon the oral arguments, the record, and the parties' briefs, we affirm the post-conviction court's dismissal of the petition for post-conviction relief.

_____
NORMA McGEE OGLE, JUDGE